# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AL LUTZKER, Derivatively on Behalf of SAREPTA THERAPEUTICS, INC., | Case No. |
| Plaintiff, | |
| v. | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT |
| DOUGLAS S. INGRAM, SANDESH MAHATME, M. KATHLEEN BEHRENS, RICHARD J. BARRY, MICHAEL W. BONNEY, MARY ANN GRAY, CLAUDE NICAISE, and HANS WIGZELL, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| SAREPTA THERAPEUTICS, INC. | |
| Nominal Defendant. | |

Plaintiff Al Lutzker ("Plaintiff"), by and through his counsel, derivatively on behalf of nominal defendant Sarepta Therapeutics, Inc. ("Sarepta" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Sarepta with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Sarepta; (iii) a purported class action lawsuit filed in the United Stated District Court for the Southern District of New York against Sarepta, and defendants Douglas S. Ingram ("Ingram") and Sandesh Mahatme ("Mahatme"), captioned *Salinger v. Sarepta Therapeutics, Inc., et al.*, Case No. 1:19-cv-081223, alleging that

between September 6, 2017 and August 19, 2019 (the "Relevant Period") defendants made false and/or misleading statements and/or failed to disclose that: (1) golodirsen posed significant safety risks to patients; and (2) consequently, the New Drug Application ("NDA") package for golodirsen's accelerated approval was unlikely to receive the U.S. Food and Drug Administration ("FDA") approval (the "Securities Class Action"); and (iv) other publicly available information, including media and analyst reports concerning Sarepta.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty, insider selling, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC rule 14a-9 promulgated thereunder brought on behalf of nominal defendant Sarepta against certain officers and members of the Company's Board of Directors (the "Board").

2.      Sarepta, a medical research and drug development company, was founded in 1980 and is headquartered in Cambridge, Massachusetts.

3.      Sarepta focuses on the discovery and development of ribonucleic acid ("RNA")-based therapeutics, gene therapy, and other genetic medicine approaches for the treatment of rare diseases. Sarepta's products pipeline includes, among other drug candidates, golodirsen for the treatment of duchenne muscular dystrophy ("DMD"). Golodirsen purportedly binds to exon 53 of dystrophin pre-mRNA, which results in exclusion or skipping of exon during mRNA processing in patients with genetic mutations.

4.      On September 6, 2017, the Individual Defendants announced positive muscle biopsy results from its 4053-101 study, a Phase 1/2 first-in-human study conducted in Europe to assess the safety, tolerability, pharmacokinetics, and efficacy of golodirsen in twenty-five male

subjects with confirmed deletions of the DMD gene amenable to skipping exon 53 (the "4053-101 Study").

5.       According to the Individual Defendants, the 4053-101 Study was comprised of two parts. In Part 1, twelve patients were randomized to receive a dose titration of golodirsen (eight patients) or placebo (four patients). At the end of Part 1, (dose titration), all twelve patients continued on golodirsen and an additional thirteen patients started golodirsen (Part 2). In Part 2, all twenty-five patients were treated for an additional forty-eight weeks at the time of muscle biopsy. The analysis included biopsies of the bicep muscle at baseline and on-treatment at the Part 2 Week 48 time point.

6.       On February 14, 2019, the Individual Defendants announced that the FDA's Division of Neurology (the "FDA Neurology Division") had accepted the Company's NDA "seeking accelerated approval for golodirsen (SRP-4053) and provided a regulatory action date of August 19, 2019."

7.       According to the Individual Defendants, the Company completed its NDA at the end of 2018 as part of a rolling submission and requested priority review, which was granted. Additionally, the NDA included data from the 4053-101 Study.

8.       Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements regarding Sarepta's business, operational and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) golodirsen posed significant safety risks to patients; (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.

9.      On August 19, 2019, post-market, the Individual Defendants announced receipt of a Complete Response Letter ("CRL") from the FDA regarding the Company's NDA seeking accelerated approval of golodirsen for the treatment of DMD. The Individual Defendants disclosed that "[t]he CRL generally cites two concerns: the risk of infections related to intravenous infusion ports and renal toxicity seen in pre-clinical models of golodirsen and observed following administration of other antisense oligonucleotides."

10.     On this news, Sarepta's stock price fell $18.24 per share, or 15.16%, to close at $102.07 per share on August 20, 2019.

11.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law, Sarepta has sustained damages as described below.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because they reside in this district or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state, has consented to service in this state and is incorporated within this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Sarepta occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15.     Plaintiff is a current shareholder of Sarepta common stock and has continuously held Sarepta common stock at all relevant times.

16.     Nominal defendant Sarepta is a Delaware corporation with principal executive offices located at 215 First Street, Suite 415, Cambridge, Massachusetts. Sarepta securities trade in an efficient market on the NASDAQ under the ticker symbol "SRPT."

17.     Defendant Ingram has served as Sarepta's President, Chief Executive Officer ("CEO") and a member of the Board since June 2017.   During the Relevant Period, defendant Ingram received the following excessive compensation: $56,866,241 during the fiscal year ended December 31, 2017 and $1,433,872 during the fiscal year ended December 31, 2018.

18.     Defendant Mahatme has served as Sarepta's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times.  During the Relevant Period, defendant Mahatme received the following excessive compensation: $2,200,133 during the fiscal year ended December 31, 2017 and $4,219,084 during the fiscal year ended December 31, 2018.  In addition, defendant Mahatme sold the following shares with insider information regarding Sarepta's lack of internal controls and that (i) golodirsen posed significant safety risks to patients; and (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval, which

resulted in Sarepta stock trading at artificially inflated prices at the time of his stock sales:

| Insider | Share Price | Amount Sold | Value | Date |
|---|---|---|---|---|
| **Mahatme** | $127.74 | 107,524 | $13,735,115.76 | 2018-10-24 |
| **Mahatme** | $130.00 | 43,802 | $5,694,260 | 2019-01-30 |
| **Mahatme** | $130.72 | 21,198 | $2,771,002.56 | 2019-01-31 |
| **Mahatme** | $145.00 | 65,000 | $9,425,000 | 2019-02-07 |

19.     Defendant M. Kathleen Behrens ("Behrens") has served as a member of the Board since March 2009 and Chairperson of the Board since April 2015. She served as a member and chair of the Audit Committee during the Relevant Period and also currently serves as a member of the Research and Development Committee of the Board.  In addition, defendant Behrens sold the following shares with insider information regarding Sarepta's lack of internal controls and that (i) golodirsen posed significant safety risks to patients; and (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval, which resulted in Sarepta stock trading at artificially inflated prices at the time of her stock sales:

| Insider | Share Price | Amount Sold | Value | Date |
|---|---|---|---|---|
| **Behrens** | $131.71 | 10,000 | $1,317,100 | 2018-10-31 |

20.     Defendant Richard J. Barry ("Barry"), a long-time stockholder of the Company, has served as a member of the Board since June 2015. He currently serves as member and chair of

the Nominating and Corporate Governance Committee, a member of the Compensation Committee of the Board and served as a member of the Audit Committee during the Relevant Period. In addition, defendant Barry sold the following shares with insider information regarding Sarepta's lack of internal controls and that (i) golodirsen posed significant safety risks to patients; and (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval, which resulted in Sarepta stock trading at artificially inflated prices at the time of his stock sales:

| Insider | Share Price | Amount Sold | Value | Date |
|---------|-------------|-------------|-------|------|
| **Barry** | $130.34 | 75,000 | $9,775,500 | 2018-06-27 |

21.     Defendant Michael W. Bonney ("Bonney") was elected to the Board in December 2017. Defendant Bonney served as a member of the Audit Committee during the Relevant Period.

22.     Defendant Mary Ann Gray ("Gray") was elected to the Board in December 2018. Defendant Gray also serves as a member of the Compensation and Nominating and Corporate Governance Committees of the Board.

23.     Defendant Claude Nicaise ("Nicaise") has served as a member of the Board since June 2015. Defendant Nicaise currently serves as a member of the Compensation Committee and as a member of the Research and Development Committee of the Board.

24.     Defendant Hans Wigzell ("Wigzell") has served as a member of the Board since June 2010. Defendant Wigzell currently serves as chair of the Research and Development Committee and as a member of the Nominating and Corporate Governance committee of the Board.  In addition, defendant Wigzell sold the following shares with insider information regarding

Sarepta's lack of internal controls and that (i) golodirsen posed significant safety risks to patients; and (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval, which resulted in Sarepta stock trading at artificially inflated prices at the time of his stock sales:

| Insider | Share Price | Amount Sold | Value | Date |
|---------|-------------|-------------|-------|------|
| **Wigzell** | $55.89 | 6,667 | $372,618.63 | 2017-11-30 |
| **Wigzell** | $140.50 | 6,667 | $936,713.50 | 2018-11-01 |
| **Wigzell** | $120.00 | 10,000 | $1,200,000 | 2019-05-23 |

25.    The defendants referenced above in ¶¶ 17-24 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the

use and preservation of its property and assets, and the highest obligations of fair dealing.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Sarepta were required to, among other things:

    a.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    b.  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c.  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such

conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e. ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

29.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30.     In addition, the Company has also adopted a Code of Business Conduct and Ethics (the "Code").  The Introduction of the Code states:

> SAREPTA Therapeutics, Inc. (the "Company") is committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics (the "Code") reflects the business practices and principles of behavior that support this commitment.

31.     The Code goes on to state:

**1.  Honest and Ethical Conduct**

> It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

**2.  Legal Compliance**

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our

success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Chief Compliance Officer (as provided in Section 16).

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including e-mails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

*** 

## 9. Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, stockholders and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

*** 

## 14. Media/Public Discussions

It is our policy to disclose material information concerning the Company to the public only through specific limited channels to avoid inappropriate publicity and to ensure that all those with an interest in the company will have equal access to information. All inquiries or calls from the press and financial analysts should be referred to the Chief Executive Officer ("CEO"), General Counsel or

the corporate communications department. We have designated our CEO as our official spokesperson for financial matters, marketing, technical and other related information. Unless a specific exception has been made by the CEO, the CEO is the only person who may communicate with the press on behalf of the Company.

32.     Furthermore, as noted in the Company's DEF 14A filed with the SEC on April 26, 2019 (the "2019 Proxy"):

The Board and its standing committees (audit, compensation, nominating and corporate governance and research and development) oversee the management of risks inherent in the operation of our business. The Board has delegated certain risk management responsibilities to its committees. The Board and the audit committee evaluate our policies with respect to risk assessment and risk management, and monitor our liquidity risk, regulatory risk, operational risk and enterprise risk by regular reviews with management and external auditors and other advisors. In its periodic meetings with the independent accountants, the audit committee discusses the scope and plan for the audit and includes management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs. As part of its responsibilities, the compensation committee reviews the impact of our executive compensation program and the associated incentives to determine whether they present a significant risk to us. The compensation committee has concluded, based on its review and analysis of our compensation policies and procedures, that such policies and procedures are not reasonably likely to have a material adverse effect on us. The Board and the nominating and corporate governance committee monitor our governance and succession risk by regular review with management and outside advisors. The Board and the research and development committee evaluate progress on projects or related research and development activities intended to identify, screen or advance drug candidates either for the Company´s proprietary benefit or as part of an external collaboration.

33.     Moreover, the Board's Audit Committee, which is and had been comprised of defendants Behrens, Barry, and Bonney during the Relevant Period, has a heightened duty under the Audit Committee Charter to, among other things:

Review (a) the status of compliance with laws, regulations, and internal procedures, including, without limitation, the Company's policies on ethical business practices; and (b) the scope and status of systems designed to promote Company compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and third parties as determined by the Committee and report on the same to the Board of Directors.

34.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty,  the violations of Section 14(a) and Rule 14a-9, and other violations of law, as described herein.

## SUBSTANTIVE ALLEGATIONS

BACKGROUND

35.     Sarepta, a medical research and drug development company, was founded in 1980 and is headquartered in Cambridge, Massachusetts.

36.     Sarepta focuses on the discovery and development of RNA-based therapeutics, gene therapy, and other genetic medicine approaches for the treatment of rare diseases. Sarepta's products pipeline includes, among other drug candidates, golodirsen for the treatment of DMD. Golodirsen purportedly binds to exon 53 of dystrophin pre-mRNA, which results in exclusion or skipping of exon during mRNA processing in patients with genetic mutations.

37.     On September 6, 2017, pre-market, defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell announced positive muscle biopsy results from its 4053-101 study, a Phase 1/2 first-in-human study conducted in Europe to assess the safety, tolerability, pharmacokinetics, and efficacy of golodirsen in twenty-five male subjects with confirmed deletions of the DMD gene amenable to skipping exon 53.

38.     According to defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell, the 4053-101 Study was comprised of two parts. In Part 1, twelve patients were randomized to receive a dose titration of golodirsen (eight patients) or placebo (four patients). At the end of Part 1 (dose titration), all twelve patients continued on golodirsen and an additional thirteen patients started golodirsen (Part 2). In Part 2, all twenty-five patients were treated for an additional forty-eight weeks at the time of muscle biopsy. The analysis included biopsies of the

bicep muscle at baseline and on-treatment at the Part 2 Week 48 time point.

39.     On February 14, 2019, the Individual Defendants announced that the FDA Neurology Division had accepted the Company's NDA "seeking accelerated approval for golodirsen (SRP-4053) and provided a regulatory action date of August 19, 2019." According to the Individual Defendants, the Company completed its NDA at the end of 2018 as part of a rolling submission and requested priority review, which was granted. Additionally, the NDA included data from the 4053-101 Study.

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD**

40.     The Relevant Period begins on September 6, 2017, when defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell issued a press release on behalf of the Company, announcing positive results from the 4053-101 Study (the "September 2017 Press Release"). The September 2017 Press Release highlighted that golodirsen's results from the 4053-101 Study "achieved statistical significance on all primary and secondary biological endpoints" and "further validate[d] the Company's exon-skipping platform for the treatment of DMD[,]" without specifying what, if any, safety concerns were indicated by that study. Specifically, the September 2017 Press Release stated, in relevant part:

> All 25 participants displayed an increase in skipping exon 53 ($p < 0.001$) over baseline levels, representing a 100 percent response rate as measured by RT-PCR and demonstrating proof of mechanism. Mean dystrophin protein increased to 1.019 percent of normal compared to a mean baseline of 0.095 percent of normal ($p < 0.001$) as measured by Western blot, the primary biological endpoint in the study, representing a 10.7 fold increase from baseline. The study also showed a statistically significant increase in dystrophin immunofluorescence as measured by immunohistochemistry (IHC), the secondary biological endpoint in the study, confirming sarcolemma-associated protein expression and distribution.

> Francesco Muntoni, principal investigator for this study . . . said, "All treated boys showed the anticipated exon skipping after treatment and this resulted in a mean increase of dystrophin protein, as measured by Western blot, from 0.095 percent at

baseline to 1.019 percent of normal after at least one-year of treatment with golodirsen."

"These data were also supported by the highly statistically significant increase of dystrophin expression at the sarcolemma, as measured by recently developed validated methodology. This is now the second exon-skipping agent to have shown a statistically significant increase in dystrophin production, validating the exon-skipping approach to treating DMD boys with amenable mutations."

41.     The September 2017 Press Release also quoted defendant Ingram, who touted "the rigor" with which defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell designed methods for and executed the 4053-101 Study. Defendant Ingram also stressed how golodirsen validated Sarepta's broad application of the Company's exon-skipping platform. In short, defendant Ingram vigorously championed golodirsen after receiving positive indications for its use from the 4053-101 Study, without pausing to address the potential safety concerns associated with the drug, stating, in relevant part:

These data demonstrate statistically significant exon skipping, dystrophin production and localization, which further validate the broad application of our exon-skipping platform and aligns with our strategic imperative to expand and improve the treatment choices for the majority of patients with DMD . . . .

Additionally, the rigor with which we designed our methods and executed this study speaks to our commitment to continuous improvement and scientific excellence.

42.     Finally, the September 2017 Press Release touted golodirsen's use of Sarepta's proprietary phosphorodiamidate morpholino oligomer ("PMO") chemistry and exon-skipping technology, which purportedly allowed golodirsen to skip exon 53 of the gene attributable to DMD. The September 2017 Press Release also noted that golodirsen was one of the drug candidates being evaluated in the Company's ESSENCE study, a global, randomized double-blind, placebo-controlled study evaluating efficacy and safety in patients amenable to skipping exons 45 or 53. Specifically, the September 2017 Press Release stated, in relevant part:

Golodirsen uses Sarepta's proprietary phosphorodiamidate morpholino oligomer

(PMO) chemistry and exon-skipping technology to skip exon 53 of the *DMD* gene. Golodirsen is designed to bind to exon 53 of dystrophin pre-mRNA, resulting in exclusion, or "skipping," of this exon during mRNA processing in patients with genetic mutations that are amenable to exon 53 skipping. Exon skipping is intended to allow for production of an internally truncated but functional dystrophin protein.

Golodirsen is one of the investigational candidates currently being evaluated in the ESSENCE study, a global, randomized double-blind, placebo-controlled study evaluating efficacy and safety in patients amenable to skipping exons 45 or 53.

43.     On March 1, 2018, defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell filed Sarepta's Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K reiterated the positive results from the 4053-101 Study, again failing to mention what, if any, safety concerns were associated with drug. Specifically, the 2017 10-K stated, in relevant part:

> *Golodirsen (SRP-4053)*. We are enrolling and dosing patients in ESSENCE (Study 4045-301), our phase 3 placebo controlled confirmatory trial in patients who have a confirmed mutation of the DMD gene that is amenable to exon 45 or 53 skipping using casimersen and golodirsen, respectively. Golodirsen, an exon 53- skipping product candidate, is currently in the clinic as part of a Phase 1/2 study. Part I has been completed, and Part II, an open-label portion of this study, is ongoing (Study 4053-101). In September 2017, we announced positive results of an analysis that included biopsies of the bicep muscle at baseline and on-treatment at the Part II, Week 48 time point. The study results demonstrated statistical significance on all primary and secondary biological endpoints. Golodirsen will potentially address one of the most prevalent sets of mutations in DMD that are amenable to exon-skipping. We have recently announced that we are targeting a meeting with the FDA in the first quarter of 2018 to discuss golodirsen.

44.     The 2017 10-K also contained merely generic, boilerplate representations concerning the risk that Sarepta's clinical studies could fail to demonstrate the safety of its product candidates, stating, in relevant part:

> ***Our pre-clinical and clinical trials may fail to demonstrate acceptable levels of safety, efficacy, and quality of our product candidates, including those based on our PMO-based technologies, which could prevent or significantly delay their regulatory approval.***

[ ] Ongoing and future pre-clinical and clinical trials of our product candidates may not show sufficient safety, efficacy or adequate quality to obtain or maintain regulatory approvals. For example, although the pre-clinical data for PPMO collected to date is promising, the additional data we collect, including in the clinic, may not be consistent with the pre-clinical data or show a safe benefit that warrants further development or pursuit of a regulatory approval for PPMO product candidates. Furthermore, success in pre-clinical and early clinical trials does not ensure that the subsequent trials will be successful, nor does it predict final results of a confirmatory trial. For example, we cannot provide assurances that data from our EXONDYS 51 ongoing studies will be positive and consistent through the study periods or that the interpretation by regulators, such as the FDA or EMA, of the data we collect for our product candidates will be consistent with our interpretations. If our study data do not consistently or sufficiently demonstrate the safety or efficacy of any of our product candidates, including for those that are based on our PMO-based technologies, then the regulatory approvals for such product candidates could be significantly delayed as we work to meet approval requirements, or, if we are not able to meet these requirements, such approvals could be withheld or withdrawn.

(Emphasis in original). This risk warning was a generic "catch-all" provision that was not tailored to Sarepta's actual known risks with respect to golodirsen's safety profile.

45.     The 2017 10-K was signed by defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell.

46.     Appended as exhibits to the 2017 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the defendants Ingram and Mahatme certified that "the [2017 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in [the 2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of Sarepta Therapeutics, Inc."

47.     On March 12, 2018, defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell issued a press release announcing the Company's plan to submit an NDA to the FDA for accelerated approval of golodirsen in patients with DMD amenable to skipping exon 53 (the "March 2018 Press Release").  In the March 2018 Press Release, Sarepta touted the results

of the 4053-101 Study, highlighted how "[t]he Company met with the FDA Division of Neurology Products in February to obtain guidance on the regulatory pathway for golodirsen," and utterly failed to mention any possible or known risks related to golodirsen. Instead, the March 2018 Press Release merely stated that the 4053-101 Study had "assess[ed] the safety [and] tolerability . . . of golodirsen," and that, based on the results of that study and the FDA's guidance, the Company would move towards completing a rolling submission of an NDA for golodirsen by year-end 2018. Specifically, the March 2018 Press Release stated, in relevant part:

> Sarepta . . . recently received final minutes from a February 2018 Type C meeting held with the Division of Neurology Products, United States Food and Drug Administration (the Division), to solicit the Division's guidance on the development pathway for Sarepta's therapeutic candidate, golodirsen[.]
>
> * * *
>
> As previously announced in the third quarter of 2017, Sarepta's 4053-101 study – a Phase 1/2 study to assess the safety, tolerability, pharmacokinetics and efficacy of golodirsen in 25 boys with confirmed deletions of the DMD gene amenable to exon 53 skipping – demonstrated statistically significant results in favor of golodirsen on all biological endpoints[.]
>
> Based on the results of Study 4053-101 and informed now by FDA's feedback, Sarepta intends to complete a rolling submission of a golodirsen NDA by year-end 2018, seeking accelerated approval of golodirsen based on an increase in dystrophin protein as a surrogate endpoint.

48.     The March 2018 Press Release also quoted defendant Ingram, who touted how the FDA Neurology Division had essentially outlined Sarepta's path to success for the proposed golodirsen NDA, stating that the FDA Neurology Division's guidance had been "thoughtful and direct . . . regarding golodirsen," and that the FDA Neurology Division had "engage[d] and provide[d] clear direction to [defendants Ingram, Mahatme, Behrens, Barry, Bonney, Nicaise and Wigzell] on the steps necessary to support an NDA submission for accelerated approval."

49.     Finally, the March 2018 Press Release noted that the complete submission of Sarepta's NDA for golodirsen would require "long-term animal toxicology studies, which will be completed in the fourth quarter of 2018."

50.     On December 20, 2018, the Individual Defendants issued a press release announcing that it had completed submission of its NDA seeking approval of golodirsen in patients with DMD amenable to skipping exon 53 (the "December 2018 Press Release"). In the December 2018 Press Release, the Individual Defendants again touted the results of the 4053-101 Study, touted the fact that the 4053-101 Study had assessed the safety and tolerability of golodirsen, and that the 4053-101 Study had been included in the Company's NDA for golodirsen. Specifically, the December 2018 Press Release stated, in relevant part:

> The completion of the rolling submission for golodirsen includes data from the 4053-101 study assessing the safety, tolerability, pharmacokinetics and dystrophin expression of golodirsen in 25 boys with confirmed deletions of the DMD gene amenable to exon 53 skipping. The study demonstrated statistically significant results in favor of golodirsen on all biological endpoints, including properly exon-skipped RNA transcript using reverse transcription polymerase chain reaction, increase in quantity of dystrophin expression from baseline using Western blot and increase in dystrophin intensity as measured by immunohistochemistry.

51.     The December 2018 Press Release also failed to address what, if any, safety issues were indicated by golodirsen's use based on prior and ongoing studies, even though the drug's safety had been assessed in the 4053-101 Study and was being assessed on an ongoing basis in Sarepta's ESSENCE study. Rather, the December 2018 Press Release touted that "[i]f the golodirsen NDA is filed and granted accelerated approval, the company's ESSENCE study (4045-301) could serve as a post-marketing confirmatory study."

52.     Finally, the December 2018 Press Release quoted defendant Ingram, who used the completed submission of the golodirsen NDA as another marketing opportunity for the drug and the PMO technology facilitating it, stating, in relevant part:

We are grateful for the patients and clinicians who have participated in the study with an aim to advance treatment for all patients with Duchenne Sarepta is committed to developing therapies to benefit the greatest possible percentage of patients affected by Duchenne. Our proprietary PMO technology remains central to our commitment to patients with Duchenne. Combined, EXONDYS 51® (eteplirsen), golodirsen, and casimersen, have the potential to treat nearly 30 percent of patients with Duchenne[.]

53.     On February 14, 2019, the Individual Defendants issued a press release announcing that the FDA's Neurology Division had accepted the Company's NDA "seeking accelerated approval for golodirsen (SRP-4053) and provided a regulatory action date of August 19, 2019" (the "February 2019 Press Release"). As with prior press releases discussed above, the February 2019 Press Release touted the inclusion of Sarepta's data from the 4053-101 study assessing the safety and tolerability of golodirsen. Specifically, the February 2019 Press Release stated, in relevant part:

The company completed its NDA at the end of 2018 as part of a rolling submission and requested priority review, which was granted. The company previously received orphan drug designation for golodirsen. The NDA includes data from the 4053-101 study assessing the safety, tolerability, pharmacokinetics and dystrophin expression of golodirsen in 25 boys with confirmed deletions of the dystrophin gene amenable to exon 53 skipping. The study demonstrated statistically significant results in favor of golodirsen on all biological endpoints, including properly exon-skipped RNA transcript using reverse transcription polymerase chain reaction, increase in quantity of dystrophin expression from baseline using Western blot and increase in dystrophin intensity as measured by immunohistochemistry.

54.     The February 2019 Press Release also utterly failed to address what, if any, safety issues were indicated by golodirsen's use based on prior and ongoing studies, even though the drug's safety had been assessed in the 4053-101 Study and was being assessed on an ongoing basis in Sarepta's ESSENCE study. Rather, the February 2019 Press Release touted  that "Sarepta's ongoing ESSENCE study (4045-301), a global, randomized double-blind, placebo- controlled study assessing the safety and efficacy of golodirsen and casimersen, our exon 45 skipping agent," could possibly serve as a post-marketing confirmatory study for golodirsen.

55.     On February 28, 2019, at the behest of the Individual Defendants, Sarepta filed its

Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating

results for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K largely

regurgitated the positive information concerning golodirsen's regulatory development as described

in prior press releases, while again wholly failing to disclose what, if any, safety concerns were

indicated by golodirsen's use. Specifically, the 2018 10-K stated, in relevant part:

> _Golodirsen (SRP-4053)_ uses our PMO chemistry and exon-skipping technology to
> skip exon 53 of the DMD gene. Golodirsen is designed to bind to exon 53 of
> dystrophin pre-mRNA, resulting in exclusion, or "skipping", of this exon during
> mRNA processing in patients with genetic mutations that are amenable to exon 53
> skipping. We are enrolling and dosing patients in ESSENCE (4045-301), our Phase
> 3 placebo controlled confirmatory trial in patients who have a confirmed mutation
> of the DMD gene that is amenable to exon 45 or 53 skipping using casimersen and
> golodirsen, respectively. Golodirsen is also being evaluated in a Phase 1/2 trial
> having two parts. Part I of the Phase 1/2 trial has been completed, and Part II, an
> open-label portion of the trial, is expected to be completed in 2019 (Study 4053-
> 101). In September 2017, we announced positive results of an analysis that included
> biopsies of the bicep muscle at baseline and on-treatment at the Part II, Week 48
> time point. The 4053-101 interim trial results demonstrated statistical significance
> on all primary and secondary biological endpoints. In December 2018, we
> completed the submission of our rolling NDA to the FDA seeking accelerated
> approval for golodirsen. The FDA accepted the NDA and granted priority review
> status for golodirsen with a targeted regulatory action date of August 19, 2019. The
> FDA also indicated that it does not intend to conduct an advisory board for
> golodirsen.

56.     The 2018 10-K also contained merely generic, boilerplate representations

concerning the risk that Sarepta's pre-clinical and clinical trials could fail to demonstrate

acceptable levels of safety, which could prevent or significantly delay regulatory approval.

Specifically, the 2018 10-K stated, in relevant part:

> To obtain the requisite regulatory approvals to market and sell any of our product
> candidates, we must demonstrate, through extensive pre-clinical and clinical trials,
> that the product candidate is safe and effective in humans.
>
> Furthermore, success in pre-clinical and early clinical trials does not ensure that the
> subsequent trials will be successful, nor does it predict final results of a

confirmatory trial. Some of our clinical trials were conducted with small patient populations and were not blinded or placebo-controlled, making it difficult to predict whether the favorable results that we observed in such trials will be repeated in larger and more advanced clinical trials . . . . Similarly, we cannot provide assurances that data from our studies with respect to EXONDYS 51, golodirsen, casimersen and other gene therapy-based product candidates will be positive and consistent through the study periods or that the interpretation by regulators, such as the FDA or EMA, of the data we collect for our product or product candidates will be consistent with our interpretations.

57.     This risk warning was a generic "catch-all" provision that was not tailored to Sarepta's actual known risks with respect to golodirsen's safety profile.

58.     The 2018 10-K also contained merely generic, boilerplate representations related to the risk that Sarepta's product candidates may cause undesirable side effects or have other properties that could delay or prevent regulatory approval of product candidates. To this end, the 2018 10-K stated, in relevant part:

Our product candidates may cause undesirable side effects. In addition to side effects caused by product candidates, the administration process or related procedures also can cause adverse side effects. If any such adverse events occur in our trials, we may decide, or the FDA, the EMA or other regulatory authorities could order us, to halt, delay or amend preclinical development or clinical development of our product candidates or we may be unable to receive regulatory approval of our product candidates for any or all targeted indications. Even if we are able to demonstrate that all future serious adverse events are not product-related, such occurrences could affect patient recruitment or the ability of enrolled patients to complete the trial. Moreover, if we elect, or are required, to delay, suspend or terminate any clinical trial of any of our product candidates, the commercial prospects of such product candidates may be harmed and our ability to generate product revenues from any of these product candidates may be delayed or eliminated. Any of these occurrences may harm our ability to develop other product candidates and may harm our business, financial condition and prospects significantly.

59.     This risk warning was a generic "catch-all" provision that was not tailored to Sarepta's actual known risks with respect to golodirsen's safety profile.

60.     Finally, the 2018 10-K contained merely generic, boilerplate representations concerning the risk that Sarepta's drug candidate NDAs could be denied or face significant delays,

which could have a material negative impact on the Company's business, stating, in relevant part:

> Our ability to obtain the government or regulatory approvals required to commercialize any of our product candidates in any jurisdiction, including in the U.S. or the EU, cannot be assured, may be significantly delayed or may never be achieved for various reasons including the following:
>
> * * *
>
> The regulatory approval process for product candidates targeting orphan diseases, such as DMD, that use new technologies and processes, such as antisense oligonucleotide therapies, gene therapy and other alternative approaches or endpoints for the determination of efficacy is uncertain due to, among other factors, evolving interpretations of a new therapeutic class, the broad discretion of regulatory authorities, lack of precedent, small safety databases, varying levels of applicable expertise of regulators or their advisory committees, scientific developments, changes in the competitor landscape, shifting political priorities and changes in applicable laws, rules or regulations and interpretations of the same. As a result of uncertainty in the approval process for products intended to treat serious rare diseases, we may not be able to anticipate, prepare for or satisfy requests or requirements from regulatory authorities, including completing and submitting planned NDAs, BLAs and MAAs for our product candidates, in a timely manner, or at all. Examples of such requests or requirements could include, but are not limited to, conducting additional or redesigned trials and procedures (e.g., additional safety data, patient muscle biopsies, dystrophin analyses and using different assays), repeating or completing additional analysis of our data, or providing additional supportive data. In addition, in the U.S., an FDA advisory committee or regulators may disagree with our data analysis, interpretations and conclusions at any point in the approval process, which could negatively impact the approval of our NDA or BLA or result in a decision by the Company not to proceed with an NDA or BLA submission for a product candidate based on feedback from regulators.

61.    This risk warning was a generic "catch-all" provision that was not tailored to Sarepta's actual known risks with respect to golodirsen's safety profile.

62.    The 2018 10-K was signed by each of the Individual Defendants.

63.    Appended as exhibits to the 2018 10-K were signed SOX certifications, wherein defendants Ingram and Mahatme certified that "the [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in [the 2018 10-K] fairly presents, in all material respects, the financial condition and

results of operations of Sarepta Therapeutics, Inc."

64.     The statements referenced in ¶¶ 40-63 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) golodirsen posed significant safety risks to patients; (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval; and (iii) as a result, Sarepta's public statements were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

65.     On August 19, 2019, post-market, the Individual Defendants issued a press release announcing receipt of a CRL from the FDA regarding the Company's NDA seeking accelerated approval of golodirsen for the treatment of DMD (the "August 2019 Press Release").  Specifically, the August 2019 Press Release stated, in relevant part:

> Sarepta . . . received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding the New Drug Application (NDA) seeking accelerated approval of golodirsen injection for the treatment of Duchenne muscular dystrophy (DMD) in patients with a confirmed mutation amenable to exon 53 skipping.

> The CRL generally cites two concerns: the risk of infections related to intravenous infusion ports and renal toxicity seen in pre-clinical models of golodirsen and observed following administration of other antisense oligonucleotides. Renal toxicity with golodirsen was observed in pre-clinical models at doses that were ten-fold higher than the dose used in clinical studies. Renal toxicity was not observed in Study 4053-101, on which the application for golodirsen was based.

> * * *

> Sarepta will immediately request a meeting with the FDA to determine next steps.

66.     On this news, Sarepta's stock price fell $18.24 per share, or 15.16%, to close at $102.07 per share on August 20, 2019.

**MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS ISSUED BY THE INDIVIDUAL DEFENDANTS**

67.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants likewise caused the Company to issue false and misleading proxy statements.

68.     On April 26, 2018, defendants Ingram, Mahatme, Barry, Behrens, Bonney, Nicaise and Wigzell caused the Company to file with the SEC a Form DEF 14A and disseminated to shareholders a Proxy Statement (the  "2018 Proxy") in connection with the Company's annual shareholder meeting to be held on June 6, 2018. Defendants Ingram, Mahatme, Barry, Behrens, Bonney, Nicaise and Wigzell drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to Sarepta's shareholders. Defendants Ingram, Mahatme, Barry, Behrens, Bonney, Nicaise and Wigzell knew or were deliberately conscious in not knowing, that the 2018 Proxy was likewise materially false and misleading.

69.     Among other things, the 2018 Proxy sought shareholder approval for (i) the election of defendants Bonney, Ingram and Wigzell; (ii)  the approval, on a non-binding, advisory basis, of the compensation of certain executive officers (including defendants Ingram and Mahatme); and (iii) and approval of the Company's 2018 Equity Incentive Plan.  In addition, the 2018 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

70.     The 2018 Proxy also stated:

**2017 Compensation Program Highlights**

*Key Factors That Influenced 2017 Named Executive Officer Compensation*

2017 was an important year for the Company. After receiving FDA approval for its first product in September 2016, the Company entered 2017 with the goal of successfully launching EXONDYS 51 in the U.S., advancing its multiple genetic

medicine platforms and preparing for global commercialization. In the face of a challenging reimbursement landscape, the Company achieved a very successful first full year launch, doubling its original revenue guidance for 2017. In addition, the Company launched an early access program and built commercial infrastructure in the EU in preparation for a potential approval of the Company's marketing authorization application for eteplirsen. The Company also executed its strategy to maintain leadership position in the rare disease space by entering into a gene therapy exclusive license option agreement with Genethon and into a sponsored research and exclusive license option agreement with Duke University related to certain CRISPR/Cas9 technology that has the potential to restore dystrophin expression by removing or "excising" exons from the dystrophin gene. **The Company built for the future in 2017, significantly advancing its RNA-based and gene therapy pipeline, announcing positive results on its next RNA-based DMD therapy, golodirsen, commencing a first-in-human study for its second generation novel technology, PPMO, for the treatment of DMD in patients who are amenable to exon 51 skipping, bolstering its balance sheet with an equity raise and convertible note offering, and ensuring adequate manufacturing supply for clinical and commercial needs**.

(Emphasis added).

71.     The Board sought a "for" vote in connection with each of the above referenced items of business.

72.     The 2018 Proxy was false and misleading because it solicited Sarepta shareholder votes for director elections, an advisory vote on executive compensation, and the Company's 2018 Equity Incentive Plan even though defendants Ingram, Mahatme, Barry, Behrens, Bonney, Nicaise and Wigzell were aware, but had failed to disclose that: (i) golodirsen posed significant safety risks to patients; (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval; and (iii) as a result, Sarepta's public statements were materially false and misleading at all relevant times.

73.     Without this information, defendants Bonney, Ingram and Wigzell were all elected to serve as Sarepta directors, the advisory vote on executive compensation was approved and the Company's 2018 Equity Incentive Plan was approved.

74.     On April 26, 2019, defendants Ingram, Mahatme, Barry, Behrens, Bonney, Gray, Nicaise and Wigzell caused the Company to file with the SEC a Form DEF 14A and disseminated to shareholders a Proxy Statement (the "2019 Proxy") in connection with the Company's annual shareholder meeting to be held on June 6, 2019. Defendants Ingram, Mahatme, Barry, Behrens, Bonney, Gray, Nicaise and Wigzell drafted, approved, reviewed, and/or signed the 2019 Proxy before it was filed with the SEC and disseminated to Sarepta's shareholders. Defendants Ingram, Mahatme, Barry, Behrens, Bonney, Gray, Nicaise and Wigzell knew or were deliberately conscious in not knowing, that the 2019 Proxy was likewise materially false and misleading.

75.     Among other things, the 2019 Proxy sought shareholder approval for (i) the election of defendants Barry, Behrens and Nicaise, and (ii) the approval, on a non-binding, advisory basis, of the compensation of certain executive officers (including defendants Ingram and Mahatme). In addition, the 2019 Proxy contained a stockholder proposal seeking to approve an amendment to the Amended and Restated 2013 Employee Stock Purchase Plan (as amended and restated on June 27, 2016) (the "2016 ESPP") to increase the number of shares of Sarepta common stock authorized for issuance under the 2016 ESPP by 500,000 shares to 1,100,000 shares and to extend its term until April 22, 2029.  Defendants Ingram, Mahatme, Barry, Behrens, Bonney, Gray, Nicaise and Wigzell sought a "for" vote in connection with each of these items, and got their way in connection with each of these votes.

76.     In support of these votes, the 2019 Proxy once again described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

77.     The 2019 Proxy also stated:

**2018 Compensation Program Highlights**

Key Factors That Influenced 2018 Named Executive Officer Compensation

2018 was a transformative year for the Company. We not only successfully met or exceeded the great majority of our goals, but we also redefined and enhanced our ambition as an organization. We significantly advanced our RNA-based product candidates, and at the same time made much progress exploring novel gene therapy technologies to treat Duchenne muscular dystrophy ("DMD"). We built our vision for a gene therapy engine and center of excellence and defined our gene therapy hybrid manufacturing strategy. Further, through a number of strategic collaboration and licensing arrangements, we expanded our pipeline to include programs that aim to treat rare diseases in addition to DMD, such as Limb-girdle muscular dystrophies, Mucopolysaccharidosis type IIIA, Charcot-Marie-Tooth, and Pompe. More specifically, and to highlight some of our achievements, in 2018 we:

- achieved another successful year of Exondys 51 sales, with net revenue of approximately $301 million, or about 98% year over year growth;
- **in collaboration with the Food and Drug Administration ("FDA"), we defined an efficient pathway for regulatory approval for our RNA based technology**;
- **completed our submission of a new drug application ("NDA") for golodirsen with the FDA**;
- made progress with our single-ascending dose study on the first candidate of our next generation RNA technology, the PPMO, which is focused on exon 51;
- commenced and completed a proof-of-concept trial for our micro-dystrophin gene therapy in collaboration with Nationwide Children's Hospital. This trial generated positive expression level results, biological marker results, and preliminary functional results in the four patients who participated in the proof-of-concept cohort.
- defined a pathway to rapidly bring the micro-dystrophin gene therapy to the community by (1) building out our hybrid gene therapy manufacturing approach through the hiring of qualified talent and entering into significant long-term partnerships in support of gene therapy plasmid supply and manufacturing; and (2) better defining our development pathway for micro-dystrophin. Armed with the FDA's guidance, we commenced a 24-patient placebo-controlled trial with the goal of further characterizing safety and expression and demonstrating the functional benefits of robust expression of our micro-dystrophin construct.
- built out our gene therapy engine with additional programs, including a long-term strategic investment and license agreement with Lacerta Therapeutics for rights to multiple CNS-targeted gene therapy programs, including Pompe disease, an exclusive license agreement with Lysogene for MPS IIIA, and a third agreement with Nationwide

Children's Hospital for rights to a gene therapy program to treat Charcot-Marie-Tooth (CMT) neuropathy.

- significantly bolstered our culture, almost doubled our talent, and developed and implemented new project management functions. One of the results of these efforts was that in 2018 the Company was named one of the top places to work in Massachusetts in the large-company category by The Boston Globe, an honor awarded based on employee feedback.

\*\*\*

The compensation committee received reports from and discussed with management the work that was done by the Company towards each corporate goal to determine levels of achievements. The same process was followed to determine achievement of each named executive officer's functional objectives.  The compensation committee made the following determinations with respect to each group of goals: to determine achievement of each named executive officer's functional objectives.   The compensation committee made the following determinations with respect to each group of goals:

- Gene Therapy Platform: Considering the Company's shift in strategy and the rapid advancement of its gene therapy platform in 2018, including executing the micro-dystrophin program with Nationwide Children's Hospital and obtaining positive results from a Phase 1/2a clinical trial in four individuals with DMD enrolled in the trial, entering into new partnership relationships for additional gene therapy programs, defining our gene therapy hybrid manufacturing strategy, entering into long-term strategic partnerships in support of gene therapy manufacturing, and hiring empowering gene therapy talent, the compensation committee determined that the gene therapy goals were achieved at 200%.
- **RNA-targeted Platform: The Company exceeded the vast majority of its goals in this area, including defining a pathway for regulatory approval for its RNA technology, submitting an NDA for golodirsen with the FDA and taking steps to move beyond DMD with its PPMO technology. The compensation committee determined that the RNA-targeted platform goals were achieved at 90%.**
- Exondys 51: The Company met the great majority of it goals related to Exondys 51, including meeting U.S. and ex-U.S. revenue goals, enhancing access to the drug, taking initiatives to increase reimbursement, and focusing on medical affairs activities. In light of these achievements, and considering that the Company did not receive the approval of the European Medicines Agency in the EU for eteplirsen, the compensation

        committee determined that the Exondys 51 goals were achieved at 90%.

- Enablers: In 2018, the Company significantly bolstered its culture, almost doubled its talent, and developed and implemented new project management functions. One of the results of the efforts to bolster the Company's culture, was that in 2018 the Company was named one of the top places to work in Massachusetts in the large-company category by The Boston Globe, an honor awarded based on employee feedback. In light of these achievements, the compensation committee determined that the enablers goals were achieved at 190%.

(Emphasis added).

78.     The 2019 Proxy was false and misleading because it solicited Sarepta shareholder votes for director reelection, an advisory vote on executive compensation and a vote to amend the 2016 ESPP even though defendants Ingram, Mahatme, Barry, Behrens, Bonney, Gray, Nicaise and Wigzell were aware, but had failed to disclose that: (i) golodirsen posed significant safety risks to patients; (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval; and (iii) as a result, Sarepta's public statements were materially false and misleading at all relevant times.

79.     Without this information, the Board received the results it sought in connection with the 2019 Proxy.

80.     Had truthful disclosures been made by defendants Ingram, Mahatme, Barry, Behrens, Bonney, Gray, Nicaise and Wigzell in connection with the 2019 Proxy, defendants Barry, Behrens and Nicaise would not have been elected as directors, Sarepta's shareholders would not have approved the executive compensation for 2019, and Sarepta shareholders would have voted against amending the 2016 ESPP.

**DAMAGES TO SAREPTA**

81.     As a result of the Individual Defendants' wrongful conduct, Sarepta disseminated

false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Sarepta's credibility. Sarepta has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

82.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Sarepta to the Securities Class Action.

83.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Sarepta's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

84.     Moreover, these actions have irreparably damaged Sarepta's corporate image and goodwill. For at least the foreseeable future, Sarepta will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Sarepta's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

85.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

87.     Plaintiff is an owner of Sarepta common stock and was an owner of Sarepta common stock at all times relevant hereto.

88.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

89.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Sarepta Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

90.     At the time this action was commenced, the Board consisted of seven directors: defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell (the "Director Defendants"). The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**Demand is Futile as to Defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell Because they Each Face a Substantial Likelihood of Liability**

91.     Defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell all face a substantial likelihood of liability for their individual misconduct. Defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell were directors either throughout, or part of, the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

92.     Moreover, defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially

false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

93.     Defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above. All of these defendants signed the false and misleading 2018 10-K. In addition, defendants Ingram, Behrens, Barry, Bonney, Nicaise and Wigzell also signed the false and misleading 2017 10-K.

94.     Defendants Ingram, Barry, Behrens, Bonney, Gray, Nicaise and Wigzell also drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to Sarepta's shareholders. Defendants Ingram, Barry, Behrens, Bonney, Nicaise and Wigzell knew or were deliberately conscious in not knowing, that the 2018 Proxy was likewise materially false and misleading.

95.     Defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell face a substantial likelihood of liability. If defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell were to bring a suit on behalf of Sarepta to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This

is something they will not do. For this reason demand is futile as to defendants Ingram, Behrens, Barry, Bonney, Gray, Nicaise and Wigzell.

**Defendant Ingram Lacks Independence**

96.     Demand on defendant Ingram is also futile for several reasons. Defendant Ingram has served as the Company's President, CEO and Chairman of the Board since June 2017. As such, the Company provides defendant Ingram with his principal occupation and he receives meaningful compensation, including $56,866,241 during the fiscal year ended December 31, 2017 and $1,433,872 during the fiscal year ended December 31, 2018. Moreover, defendant Ingram was also personally responsible for many of the false and misleading statements and omissions that were made, including those contained in the foregoing 10-Ks which he signed, and for which he also signed SOX certifications.

97.     Finally, defendant Ingram is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**Defendant Behrens Lacks Independence**

98.     Defendant Behrens signed, and thus personally made the false and misleading statements in the 2017 10-K and 2018 10-K. Accordingly, defendant Behrens breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Barry Lacks Independence**

99.     Defendant Barry signed, and thus personally made the false and misleading statements in the 2017 10-K and 2018 10-K. Accordingly, defendant Barry breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Bonney Lacks Independence**

100.    Defendant Bonney signed, and thus personally made the false and misleading statements in the 2017 10-K and 2018 10-K. Accordingly, defendant Bonney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Gray Lacks Independence**

101.    Defendant Gray signed, and thus personally made the false and misleading statements in the 2018 10-K. Accordingly, defendant Gray breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Nicaise Lacks Independence**

102.    Defendant Nicaise signed, and thus personally made the false and misleading statements in the 2017 10-K and 2018 10-K. Accordingly, defendant Nicaise breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Wigzell Lacks Independence**

103.    Defendant Wigzell signed, and thus personally made the false and misleading statements in the 2017 10-K and 2018 10-K. Accordingly, defendant Wigzell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Demand Is Excused as to Defendants Behrens, Barry and Bonney Because as Members of the Audit Committee They Face a Substantial Likelihood of Liability**

104.    Defendants Behrens, Barry and Bonney, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowing defendants Ingram and Mahatse to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants Behrens, Barry and Bonney were obligated to review the Company's annual reports to ensure their accuracy. Instead, defendants Behrens, Barry and Bonney, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants Behrens, Barry and Bonney.

**Demand is Excused as to Defendants Behrens and Barry due to Business Ties**

105.    Not only do defendants Behrens and Barry serve on the Sarepta Board together, but on May 30, 2019, MiMedx Group, Inc. ("MiMdex") announced that both defendants Behrens and Barry were joining the MiMedx Board of Directors.

106.    Defendant Behrens' and defendant Barry's relationship started long before Barry joined the Sarepta Board in 2015.  Defendant Barry was a founding member of Eastbourne Capital Management LLC, a large equity hedge fund investing in a variety of industries, including health care, and served as a Managing General Partner and Portfolio Manager from 1999 to its close in 2010.  In 2009, Eastbourne Nominated defendant Behrens to the board of Amylin Pharmaceuticals, Inc. ("Amylin"). Defendant Behrens sat on the Amylin board from June 2009 until Amylin's sale

in August 2012 to Bristol-Myers Squibb Company. Due to their longstanding business ties and associations, defendants Behrens and Barry are unable to consider a demand against one another.

## COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

107.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

108.    The Individual Defendants owed and owe Sarepta fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Sarepta the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

109.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

110.    Each of the Individual Defendants had actual or constructive knowledge that (i) golodirsen posed significant safety risks to patients; (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval; and (iii) as a result, Sarepta's public statements were materially false and misleading at all relevant times. These actions caused severe risks to the Company and were actually causing harm to the Company by subjecting the Company to the Securities Class Action. The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111.    The Individual Defendants caused or allowed Sarepta to lack requisite internal controls, and, as a result, regularly made false and misleading statements regarding golodirsen, its safety risks to patients and its potential FDA approval.

112.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

113.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Sarepta has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. The Individual Defendants breached their fiduciary duties owed to Sarepta and its shareholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee Sarepta's business, rendering them personally liable to the Company.

**COUNT II**
**Against Defendants Barry, Behrens, Wigzell, Ingram, and Mahatme for Unjust Enrichment**

114.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

115.     Defendants Ingram and Mahatme received performance-based compensation tied to the financial performance of Sarepta. Because Sarepta's financial results were inflated during the Relevant Period as a result of the wrongdoing alleged herein, defendants Ingram and Mahatme received more compensation than they would have received had the truth that: (i) golodirsen posed significant safety risks to patients; (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval; and (iii) as a result, Sarepta's public statements were materially false and misleading at all relevant times. Therefore, defendants Ingram and Mahatme were unjustly enriched at the expense of and to the detriment of the Company.

116.     Defendants Ingram and Mahatme knew or should have known that the Company's representations were false and misleading, all of which resulted in Sarepta's financial results and performance being artificially inflated due to the wrongdoing identified herein.

117.    Defendants Mahatme, Barry, Behrens and Wigzell were also unjustly enriched by their illegal sale of Sarepta common stock based on  material non-public information, as alleged herein.

118.    By their wrongful acts and omissions, defendants Barry, Behrens, Wigzell, Ingram, and Mahatme were unjustly enriched at the expense of, and to the detriment of, Sarepta.

119.    To remedy defendants Ingram's and Mahatme's unjust enrichment, the Court should order defendants Ingram and Mahatme to disgorge any performance-based compensation that was received during, or as a result of, the Individual Defendants' breach of fiduciary duties and other violations of law complained of herein.

### COUNT III
### Against the Individual Defendants for Violations of § 14(A) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

122.    The 2018 Proxy and 2019 Proxy each violated Section 14(a) and Rule 14a-9 because they solicited Sarepta shareholder votes for, *inter alia,* director elections, executive compensation and incentive award plans, while simultaneously misrepresenting and/or failing to disclose that: (i) golodirsen posed significant safety risks to patients; and (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval.

123.    The Individual Defendants' statements in the 2018 Proxy and 2019 Proxy, which clearly represented that the Board had director responsibilities and duties that were adhered to, that the maintained proper and effective internal controls regarding financial performance and that the Company followed a pay for performance policy for executive compensation were false and misleading because the 2018 Proxy and 2019 Proxy failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2018 Proxy and 2019 Proxy were issued, the Individual Defendants already knew of the significant problems associated with golodirsen, and therefore as a result, the Company's purported financial performance (issued under the Individual Defendants' direction and on their watch) was illusory.

124.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2018 Proxy and 2019 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2018 Proxy and 2019 Proxy.

125.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2018 Proxy and 2019 Proxy were materially false and misleading.

126.    The omissions and false and misleading statements in the 2018 Proxy and 2019 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the election of directors the compensation for executive officers, whether the advisory vote on executive compensation should be approved, and whether amendments to incentive plans were necessary or advisable. In addition, a reasonable investor would view a full

and accurate disclosure as significantly altering the "total mix" of information made available in the 2018 Proxy and 2019 Proxy and in other information reasonably available to shareholders.

127.    As a direct and proximate result of the dissemination of the false and/or misleading 2018 Proxy and 2019 Proxy the Individual Defendants used to obtain shareholder approval of and thereby elect directors, approve an advisory vote to pay excessive compensation to executive officers, and amend the Company's incentive award programs, nominal defendant Sarepta suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors and paying compensation based on inflated financials to executives) in an amount to be determined at trial.

**COUNT IV**
**Against Defendants Mahatme, Barry, Behrens and Wigzell for Breach of Fiduciary Duty in Connection with Misappropriation of Information and Insider Stock Sales**

128.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

129.    At the time of each of the stock sales set forth herein, defendants Mahatme, Barry, Behrens and Wigzell knew, but did not disclose publicly, that: (i) golodirsen posed significant safety risks to patients; (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Defendants Mahatme, Barry, Behrens and Wigzell made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

130.    At the time of their stock sales, defendants Mahatme, Barry, Behrens and Wigzell knew that the Company's share price was artificially inflated because the public was unaware that: (i) golodirsen posed significant safety risks to patients; and (ii) consequently, the NDA package for golodirsen's accelerated approval was unlikely to receive FDA approval.  Defendants Mahatme's, Barry's, Behrens' and Wigzell's sale of Sarepta common stock based on their

knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

## COUNT V
### Against the Individual Defendants for Corporate Waste

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    As a result of the Individual Defendants' failure to implement adequate controls, defendants Ingram and Mahatme were paid unwarranted compensation, bonuses, and other benefits compensation they did not earn and were not entitled to given the Company's actual performance. Sarepta received no benefit from these improper payments.

133.    As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

134.    Plaintiff, on behalf of Sarepta, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Sarepta and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Ordering defendants Ingram and Mahatme to disgorge any performance-based compensation that was received during, or as a result of, the Individual Defendants' breaches of fiduciary duties complained of herein;

D.      Ordering defendants Mahatme, Barry, Behrens, and Wigzell to disgorge their proceeds that was received from the illegal sale of Sarepta common stock based on material non-public information, as alleged herein.

E.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 7, 2020

**RIGRODSKY & LONG, P.A.**

By:  */s/ Gina M. Serra*
      Seth D. Rigrodsky (#3147)

**OF COUNSEL:**
      Brian D. Long (#4347)
      Gina M. Serra (#5387)

**HYNES & HERNANDEZ, LLC**
      300 Delaware Avenue, Suite 1220
Michael J. Hynes
      Wilmington, DE 19801
Ligaya T. Hernandez
      Telephone: (302) 295-5310
101 Lindenwood Drive, Suite 225
      Facsimile: (302) 654-7530
Malvern, PA 19355
      Email: sdr@rl-legal.com
Telephone: (484) 875-3116
      Email: bdl@rl-legal.com
Facsimile: (914) 752-3041
      Email: gms@rl-legal.com
Email: mhynes@hkh-lawfirm.com
Email: lhernandez@hkh-lawfirm.com
      *Attorneys for Plaintiff*